UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SEALED INDICTMENT** |
| v. | 25 Cr. **383** |
| LIAM TREIBERT and MICHAEL VASCONCELLOS, | |
| Defendants. | |

## COUNT ONE
### (Wire Fraud)

The Grand Jury charges:

### Introduction

1.      Between at least in or about 2016 and in or about 2023, LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants, were supposed to perform safety inspections of natural gas pipelines that were being installed throughout New York City and Westchester County. Those inspections were necessary to ensure that welds on the pipelines did not contain defects that could cause gas leaks or explosions. TREIBERT and VASCONCELLOS lied about having inspected hundreds of welds that they never actually reviewed and created fraudulent records to cover up what they had done. As a result, the utility company that operated those gas pipelines paid for hundreds of sham inspections and were deceived by TREIBERT and VASCONCELLOS into thinking that its pipelines had passed critical safety tests that TREIBERT and VASCONCELLOS never performed.

## Background

2.    Unless stated otherwise, at all times relevant to this Indictment:

### Relevant Entities

a.    "Inspection Company-1" provided various testing and inspection services to the construction industry. Inspection Company-1 was founded in or about 1986, and maintained offices in the Bronx, New York.

b.    "Inspection Company-2" provided various testing and inspection services to the construction industry.

c.    Utility-1 was a regulated utility that provided electric and natural gas services to millions of customers throughout New York City and Westchester County. From in or about 2020 until in or about 2023, Utility-1 retained Inspection Company-1 to inspect welds on natural gas pipelines that Utility-1 was installing throughout, among other locations, New York City and Westchester County. Prior to that time, Utility-1 retained Inspection Company-2 to perform similar services. Utility-1 maintained offices in the Southern District of New York.

### The Defendants

d.    LIAM TREIBERT, the defendant, was employed by Inspection Company-1 between at least in or about 2020 and in or about 2023, during which time he was tasked with testing welds on Utility-1's pipelines, among other responsibilities. Prior to 2020, TREIBERT was employed by Inspection Company-2, where he was also tasked with testing welds on natural gas pipelines.

e.    MICHAEL VASCONCELLOS, the defendant, was employed by Inspection Company-1 between at least in or about 2020 and in or about 2025, during which time he was tasked with testing welds on Utility-1's pipelines, among other responsibilities. Prior to

2

2020, VASCONCELLOS was employed by Inspection Company-2, where he was also tasked with testing welds on natural gas pipelines.

### Non-Destructive Testing of Natural Gas Pipeline Welds

f.      Utility-1 installed numerous natural gas pipelines throughout New York City and Westchester County. As part of the installation process, Utility-1 or its contractors would typically place gas pipelines into the ground in segments and then weld those segments together. Before a pipeline could be put into service, the welds throughout the pipeline had to be inspected to assess their quality. Those inspections included both a visual component and additional non-destructive testing, which consisted of additional forms of testing that did not destroy or damage the pipe or weld.

g.      One common form of non-destructive testing of pipeline welds involved radiographs, often referred to as x-rays. Radiographic testing required a team to radiograph each weld and then examine the radiograph films to identify any anomalies that would cause the weld to fall below acceptance standards. If a material anomaly was identified, then the weld would have to be repaired before the pipeline was put into service. Failure to repair a material anomaly before a pipeline was put into service could have led to critical failures, including gas leaks or explosions.

h.      According to industry and regulatory standards, radiographic testing was performed by both a Level II Radiographer and a Level I Radiographer. The Level II Radiographer was the more senior technician and was responsible for taking the radiographs and developing and interpreting the radiograph films. The Level I Radiographer functioned as an assistant to the Level II Radiographer and worked under the Level II Radiographer's direct supervision.

i.      In many cases, the pipeline that was being radiographed was in a ditch that was several feet deep. Those pipelines were often accessible only by climbing down into the ditch

3

using a ladder. After climbing into the ditch, the technicians took radiographs of the welds using an exposure device that housed a radioactive isotope referred to as the source. Given the dangers presented by radiation, the technicians set up the exposure device and radiograph films, climbed out of the ditch, walked beyond a designated safe point, and then exposed the source to the film in order to take the radiograph. The technicians often repeated this process multiple times for each weld, as the entire circumference of a pipe often could not be radiographed at once. After the entire circumference of a weld was radiographed, the technicians had to manually move the equipment to the next weld that was ready for inspection.

j.      The non-destructive testing technicians labeled each radiograph film by placing lead letters and numbers between the pipe and film before the radiograph was taken so that the letters and numbers would appear on the films. Those letters and numbers identified, among other information, the date on which the radiograph was taken, the name of the pipeline, and the identification number for the particular weld (referred to as the "weld ID"). In addition, because radiographing the full circumference of a single weld required using multiple films, the technicians would apply a "number belt" to the pipe to identify the specific segment of the weld to which a given radiograph film corresponded. For instance, the number belt would often include lead numbers every 13 inches; as a result, the top of the number belt would have a lead number "0," then 13 inches away would be a lead number "13," and then a lead number "26," and so on. When a radiograph was taken, those numbers would appear on the film and identify for the reviewing technician the portion of the weld's circumference reflected in the film.

k.      After the non-destructive testing technicians finished a series of radiographs, the Level II Radiographer developed the films on site and interpreted them to assess whether there were any material anomalies in the weld. The Level II Radiographer then prepared

4

a radiographic inspection report for Utility-1 that identified each weld that had been reviewed and supplied information about the radiographic examination.

## The Scheme to Defraud

3.      Between at least in or about 2020 and in or about 2023, LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants, were certified by Inspection Company-1 as Level II Radiographers, and purported to perform radiographic inspections of many hundreds of welds for Utility-1 across at least six pipeline projects throughout New York City and Westchester County. After a weld was purportedly radiographed and reviewed by TREIBERT and VASCONCELLOS, an employee of Inspection Company-1 typically emailed the completed radiographic inspection report to Utility-1. In addition, an employee of Inspection Company-1 would deliver the original radiograph films to Utility-1.

4.      During that period, LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants, intentionally created numerous fraudulent radiographic inspection reports and radiograph films, which they caused to be submitted to Utility-1. Specifically, TREIBERT and VASCONCELLOS repeatedly engaged in film duplication, a practice referred to in the non-destructive testing industry as "radaring." Radaring involved radiographing the same weld twice and then passing off one copy of films as having come from a second weld, or, alternatively, radiographing the same portion of a weld twice and then passing off one copy of films as having come from another portion of that same weld. For instance, a Level II Radiographer might radiograph Weld A twice, and then claim that the second set of films are of Weld B, even though the Level II Radiographer never inspected Weld B.

5.      Radaring could be detected by reviewing radiograph films because no two welds have the same shape or contour. Because each weld has a unique contour, films of two supposedly different welds that have identical contours indicates that radaring occurred.

6.      LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants, intentionally engaged in numerous instances of radaring between at least in or about 2020 and in or about 2023, while performing work for Utility-1. For example:

a.      On or about October 21, 2020, VASCONCELLOS and TREIBERT were the assigned Level II Radiographers who were supposed to perform radiographic inspections of welds on a natural gas pipeline in the vicinity of the Bronx, New York. Instead, VASCONCELLOS and TREIBERT intentionally engaged in radaring while claiming to inspect welds identified with weld IDs FW 16-78 and FW 16-84. On or about October 29, 2020, another Inspection Company-1 employee emailed Utility-1 a record stating that those welds had been radiographed and approved, copying VASCONCELLOS and TREIBERT.

b.      On or about November 11, 2020, TREIBERT was the assigned Level II Radiographer who was supposed to perform radiographic inspections of welds on a natural gas pipeline in the vicinity of Eastchester, New York. Instead, TREIBERT intentionally engaged in radaring while claiming to inspect welds identified with weld IDs FW 8-52 and FW 8-62. On or about that same day, VASCONCELLOS emailed a fraudulent radiographic inspection report to Utility-1, copying TREIBERT, which stated that those welds had been radiographed and approved.

c.      On or about November 17, 2020, TREIBERT was the assigned Level II Radiographer who was supposed to perform radiographic inspections of welds on a natural gas pipeline in the vicinity of Eastchester, New York. Instead, TREIBERT intentionally engaged in radaring while claiming to inspect welds identified with weld IDs FW 8-59 and FW 8-85. On or

about that same day, VASCONCELLOS emailed a fraudulent radiographic inspection report to Utility-1, copying TREIBERT, which stated that those welds had been radiographed and approved.

        d.      On or about November 18, 2020, TREIBERT was the assigned Level II Radiographer who was supposed to perform radiographic inspections of welds on a natural gas pipeline in the vicinity of Eastchester, New York. Instead, TREIBERT intentionally engaged in radaring while claiming to inspect welds identified with weld IDs FW 12-87 and FW 12-98. On or about that same day, VASCONCELLOS emailed a fraudulent radiographic inspection report to Utility-1, copying TREIBERT, which stated that those welds had been radiographed and approved.

        e.      On or about November 25, 2020, VASCONCELLOS was the assigned Level II Radiographer who was supposed to perform radiographic inspections of welds on a natural gas pipeline in the vicinity of the Bronx, New York. Instead, VASCONCELLOS intentionally engaged in radaring while claiming to inspect welds identified with weld IDs FW 36-41 and FW 36-42. On or about December 6, 2020, another employee of Inspection Company-1 emailed Utility-1 a record stating that those welds had been radiographed and approved, copying VASCONCELLOS and TREIBERT

        f.      On or about March 29, 2021, VASCONCELLOS was the assigned Level II Radiographer who was supposed to perform radiographic inspections of welds on a natural gas pipeline in the vicinity of the Bronx, New York. Instead, VASCONCELLOS intentionally engaged in radaring while claiming to inspect welds identified with weld IDs FW 36-155 and FW 36-156. On or about May 12, 2021, another employee of Inspection Company-1 emailed Utility-1 a record stating that those welds had been radiographed and approved, copying VASCONCELLOS and TREIBERT.

g.      On or about July 5, 2022, TREIBERT was the assigned Level II Radiographer who was supposed to perform radiographic inspections of welds on a natural gas pipeline in the vicinity of the Bronx, New York. Instead, TREIBERT intentionally engaged in radaring while claiming to inspect welds identified with weld IDs FW 36-408 and FW 36-412. On or about July 18, 2022, another employee of Inspection Company-1 emailed a fraudulent radiographic inspection report to Utility-1, copying both VASCONCELLOS and TREIBERT, which stated that those welds had been radiographed and approved.

7.      LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants, frequently took steps to conceal their fraudulent conduct. For instance, both TREIBERT and VASCONCELLOS occasionally shifted the number belt, moved the location of where the films were placed on the pipe, and flipped the films, before taking a duplicate radiograph of a weld.

8.      In total, hundreds of welds across Utility-1's pipelines installed throughout the Bronx and Westchester County between in or about 2020 and in or about 2023, were affected by radaring engaged in by LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants. And although TREIBERT and VASCONCELLOS did not actually inspect those welds, invoices for those inspections were submitted by Inspection Company-1 to Utility-1 and Utility-1 paid those invoices through bank transfers. TREIBERT and VASCONCELLOS were also paid for their work during this time by Inspection Company-1.

9.      Prior to 2020, beginning at least as early as 2016, while employed at Inspection Company-2, MICHAEL VASCONCELLOS, the defendant, engaged in additional instances of radaring when he was the assigned Level II Radiographer who was supposed to perform radiographic inspections of welds on Utility-1's pipelines.

10.    Utility-1 has begun the process of remediating this fraud, including excavating numerous pipes so that the welds impacted by radaring can be radiographed to ensure their quality. To date, Utility-1 has spent millions in remediation costs and expects to continue incurring additional costs in the future.

## Statutory Allegations

11.    From at least in or about 2016 through at least in or about 2023, in the Southern District of New York and elsewhere, LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, and aided and abetted the same, to wit, TREIBERT and VASCONCELLOS fraudulently caused Utility-1 to send Inspection Company-1 bank transfers by wire in interstate commerce as payment for radiographic testing of natural gas pipeline welds that TREIBERT and VASCONCELLOS never performed, and sent and received, and caused others to send and receive, emails in interstate commerce in furtherance of that scheme, including copies of fraudulent radiograph inspection reports and other related records.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION

12.    As a result of committing the offense alleged in Count One of this Indictment, LIAM TREIBERT and MICHAEL VASCONCELLOS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money

9

in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

13.    If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

   a.    cannot be located upon the exercise of due diligence;

   b.    has been transferred or sold to, or deposited with, a third person;

   c.    has been placed beyond the jurisdiction of the Court;

   d.    has been substantially diminished in value; or

   e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

JAY CLAYTON
United States Attorney

10